530

1  **PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

2  Name  Jackson       John         H.
           (Last)        (First)      (Initial)

3  Prisoner Number _____

4  Institutional Address  California Department of Corrections

5  _____

6  ==========================================================

7  UNITED STATES DISTRICT COURT
   NORTHERN DISTRICT OF CALIFORNIA

8  John Hardy Jackson
   (Enter the full name of plaintiff in this action.)

   CV 08  2254

9                    vs.

10 Exective Director of the Department          Case No. _____
                                                (To be provided by the clerk of court)

11 of Corrections of California                 **PETITION FOR A WRIT**
                                                **OF HABEAS CORPUS**
12 _____

                                                SBA
13 _____

                                                E-filing  (PR)
14 (Enter the full name of respondent(s) or jailor in this action)
   Exective Director Calif. DOC

15 ==========================================================

16        Read Comments Carefully Before Filling In

17 When and Where to File

18        You should file in the Northern District if you were convicted and sentenced in one of these

19 counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa,

20 San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma.  You should also file in

21 this district if you are challenging the manner in which your sentence is being executed, such as loss of

22 good time credits, and you are confined in one of these counties.  Habeas L.R. 2254-3(a).

23        If you are challenging your conviction or sentence and you were not convicted and sentenced in

24 one of the above-named fifteen counties, your petition will likely be transferred to the United States

25 District Court for the district in which the state court that convicted and sentenced you is located.  If

26 you are challenging the execution of your sentence and you are not in prison in one of these counties,

27 your petition will likely be transferred to the district court for the district that includes the institution

28 where you are confined.  Habeas L.R. 2254-3(b).

Who to Name as Respondent

You must name the person in whose actual custody you are. This usually means the Warden or jailor. Do not name the State of California, a city, a county or the superior court of the county in which you are imprisoned or by whom you were convicted and sentenced. These are not proper respondents.

If you are not presently in custody pursuant to the state judgment against which you seek relief but may be subject to such custody in the future (e.g., detainers), you must name the person in whose custody you are now <u>and</u> the Attorney General of the state in which the judgment you seek to attack was entered.

A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

1. What sentence are you challenging in this petition?

(a)    Name and location of court that imposed sentence (for example; Alameda County Superior Court, Oakland):

<u>Superior Court</u>    <u>Santa Clara</u>

Court                    Location

(b)    Case number, if known  <u>BB409126</u>

(c)    Date and terms of sentence  <u>June 29, 2006 (210 to life CS to CO, 12 yr</u>

(d)    Are you now in custody serving this term? (Custody means being in jail, on parole or probation, etc.)    Yes <u>X</u>    No <u>   </u>

Where?

Name of Institution: _____

Address: _____

2. For what crime were you given this sentence? (If your petition challenges a sentence for more than one crime, list each crime separately using Penal Code numbers if known. If you are challenging more than one sentence, you should file a different petition for each sentence.)

<u>counts 1-6 288(B) Loudn Act on child/7-16 288(A)Lud. Act:Child.</u>

<u>One strike lawwere alleged for multible victims(§667.61 Subts.</u>

<u>(ct 184-195)</u>

3. Did you have any of the following?

Arraignment:                    Yes  X        No _____

Preliminary Hearing:            Yes  X        No _____

Motion to Suppress:             Yes _____     No  X

4. How did you plead?

Guilty _____    Not Guilty  X    Nolo Contendere _____

Any other plea (specify) _____ None _____

5. If you went to trial, what kind of trial did you have?

Jury _____    Judge alone  X    Judge alone on a transcript _____

6. Did you testify at your trial?          Yes _____     No  X

7. Did you have an attorney at the following proceedings:

(a)    Arraignment                  Yes  X        No _____

(b)    Preliminary hearing          Yes  X        No _____

(c)    Time of plea                 Yes  X        No _____

(d)    Trial                        Yes  X        No _____

(e)    Sentencing                   Yes  X        No _____

(f)    Appeal                       Yes  X        No _____

(g)    Other post-conviction proceeding   Yes _____   No  X

8. Did you appeal your conviction?         Yes  X        No _____

(a)    If you did, to what court(s) did you appeal? 1-6 & 7-16 288(A)(B)

Court of Appeal                 Yes  X        No _____

Year: 2006        Result: Claim Denied

Supreme Court of California     Yes  X        No _____

Year: 2007        Result: Petition Denied

Any other court         \       Yes _____     No  X

Year: N/A         Result: N/A

(b)    If you appealed, were the grounds the same as those that you are raising in this

petition?                                    Yes _X___    No_____

(c)    Was there an opinion?                  Yes _X___    No_____

(d)    Did you seek permission to file a late appeal under Rule 31(a)?

                                             Yes _____    No_x___

       If you did, give the name of the court and the result:

_____N/A_____

_____

9. Other than appeals, have you previously filed any petitions, applications or motions with respect to

this conviction in any court, state or federal?        Yes _____    No_X___

       [Note: If you previously filed a petition for a writ of habeas corpus in federal court that

challenged the same conviction you are challenging now and if that petition was denied or dismissed

with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit

for an order authorizing the district court to consider this petition. You may not file a second or

subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28

U.S.C. §§ 2244(b).]

(a)    If you sought relief in any proceeding other than an appeal, answer the following

       questions for each proceeding. Attach extra paper if you need more space.

I.     Name of Court: _____Not appliable ******_____

       Type of Proceeding: _____None ******_____

       Grounds raised (Be brief but specific):

       a._____None******_____

       b._____None *****_____

       c._____None *****_____

       d._____None *****_____

       Result: _____N/A***** _____Date of Result:___***___

II.    Name of Court: _____N/A *****_____

       Type of Proceeding: _____N/A ****_____

       Grounds raised (Be brief but specific): --

a. _____ Not appliable *******_____

b. _____ Not Appleable *******_____

c. _____ Not Appleable _____

d. _____ Not Appliable _____

Result: _____ N/A ***** _____ Date of Result: _____

III.    Name of Court: _____ N/A *** _____

Type of Proceeding: _____ N/A *** _____

Grounds raised (Be brief but specific):

a. _____ Not Appliable _____

b. _____ ********* _____

c. _____ N/A ****** _____

d. _____ N/A ****** _____

Result: _____ N/A ***** _____ Date of Result: _____

IV.    Name of Court: _____ N/A ***** _____

Type of Proceeding: _____ N/A *** _____

Grounds raised (Be brief but specific):

a. _____ Not Applable *** _____

b. _____ Not Appliable **** _____

c. _____ Not Appliable***** _____

d. _____ Not Appliable ***** _____

Result: _____ N/A *** _____ Date of Result: _____

(b)    Is any petition, appeal or other post-conviction proceeding now pending in any court?

Yes _____    No _X_

Name and location of court: _____ Not Applable _____

## B. GROUNDS FOR RELIEF

State briefly every reason that you believe you are being confined unlawfully. Give facts to support each claim. For example, what legal right or privilege were you denied? What happened? Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you

1  need more space.  Answer the same questions for each claim.

2      [Note:  You must present ALL your claims in your first federal habeas petition.  Subsequent

3  petitions may be dismissed without review on the merits. 28 U.S.C. §§ 2244(b); McCleskey v. Zant,

4  499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

5      Claim One: Did the court error in failing to determine the

6  adequacy of advisements for a jury waivor in light of
   Apprendi.

7  Supporting Facts: A waiver of any fundamental right cannot be

8  accepted,unless it is voluntary, as well as knowing

9  and intelligent,made with a full awarenes of the nature

10  of the right and the consequences of the weaver.

11      Claim Two: The application of Apprendi to the one strike

12  law, court errored, in not making this determination.

13  Supporting Facts: The Apprendi V. New Jersy(2000) 530 U.S.466,

14  line of cases requires the prosecution to prove beyond a

15  reasonable doubt probation ineligility in order to allow
   as a matter of constitutional law,the one strick enhancment

16  to a defendants sentence,was the absence of this prejudicial

17      Claim Three: Whether the defination of "Dures" which includes
   the "Amorphous" terms;"hardship,satisfies constitional

18  standards of notice and enforcement.

19  Supporting Facts: Prosecutions under section 288(b) are Legion;

20  they present difficult questions of proff,especially in

21  regard to duress. The question of the constitutionality

22  of the defination of "duress"used for these prosecutions
   is an importent issue of law.(Grayned V.City ofRockford

23     (1972) 408 U.S 104.
   If any of these grounds was not previously presented to any other court, state briefly which

24  grounds were not presented and why:

25  _____

26  _____

27  _____

28  _____

1    List, by name and citation only, any cases that you think are close factually to yours so that they

2    are an example of the error you believe occurred in your case. Do not discuss the holding or reasoning

3    of these cases:

4    Apprendi V. New Jersy(2000)530 U.S. 466/Blakley V. Washington-

5    (2004)542U.S. 296,/ People V. Black(2005)35 Cal.4th 1238

6    People V. Esquibel(2006)143 Cal.App.4th 645,660.)

7    Do you have an attorney for this petition?                  Yes____    No_X_

8    If you do, give the name and address of your attorney:

9    Petitioner, will be requesting an attorney.

10    WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in

11    this proceeding. I verify under penalty of perjury that the foregoing is true and correct.

12

13    Executed on _April 23- 2008_                    _John H Jackson_

14                   Date                              Signature of Petitioner

15

16

17

18

19

20    (Rev. 6/02)

21

22

23

24

25

26

27

28

Mark D Greenberg, 99726
Attorney at Law
484 Lake Park Ave., No. 429
Oakland, CA  94610
(510) 452-3126

Attorney for Appellant
In Association with SDAP

## IN THE SUPREME COURT OF THE STATE OF CALIFORNIA

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA, | ) |
| | ) H030492 |
| Plaintiff and Respondent, | ) |
| | ) Santa Clara No. |
| vs. | ) BB409126 |
| | ) |
| JOHN HARDY JACKSON, | ) |
| | ) |
| Defendant and Appellant. | ) |

## PETITION FOR REVIEW

Appellant in the above-titled action respectfully requests review of the decision of the California Court of Appeal, Sixth Appellate District, filed on December 13, 2007, affirming his convictions on multiple counts of lewd and lascivious acts on a child under 14 (§ 288, subds. (a) and (b)) and his one-strike sentence imposed pursuant to these convictions. A copy of the Court of Appeal decision is attached hereto.

## QUESTIONS PRESENTED

1. When defendant waives his Sixth Amendment right to a jury trial, and proceeds with a court trial, must his convictions pursuant to that court trial be reversed for failure of a knowing and intelligent waiver, since the advisements on

the right to trial by jury did not convey to defendant that that right also included the right to a jury determination of sentencing facts required to raise a sentence beyond the statutory maximum?

2.  When the applicable one-strike statute designates as one of the triggering offenses for one-strike punishment, " [a] violation of subdivision (a) of Section 288, unless the defendant qualifies for probation under subdivision (c) of section 1203.066" (former § 667.61(c)(7)), does the Sixth and Fourteenth Amendments require the prosecution to prove beyond a reasonable doubt that the defendant does *not* so qualify, or is the language quoted merely a statutory dispensation allowing a grant of probation for a violation of section 288(a), which, as a probation dispensation, is not governed by federal constitutional rights, and which was anomalously placed by the Legislature in the subdivision listing triggering offenses for one-strike punishment?

3.  Is the term "duress" as used in section 288(a) unconstitutionally vague insofar as it includes the concept of threat of hardship, in addition to threat of danger and retribution, or is this Court's brief and cursory treatment of the question in *People* v. *Leal* (2004) 33 Cal.4th 999, 1009 in response to a contention raised, not by the parties, but by an *amicus*, sufficiently dispositive?

## STATEMENT OF FACTS

For purposes of this petition, the summary of evidence set forth in the Court of Appeal opinion is adequate. (Slip op., pp. 1-7.)

## ARGUMENT FOR REVIEW

### I.

### PETITION FOR REVIEW SHOUD BE GRANTED TO DETERMINE THE ADEQUACY OF ADVISEMENTS FOR A JURY WAIVER IN LIGHT OF THE *APPRENDI* LINE OF CASES

As with all the fundamental rights available to the criminal defendant, the right to trial by jury may be waived. (*People* v. *Collins* (2001) 26 Cal.4[th] 297, 305.) A waiver of any fundamental right cannot be accepted, however, unless it is voluntary, as well as knowing and intelligent, made with a full awareness of the nature of the right and the consequences of the waiver. (*Patton* v. *United States* (1930) 281 U.S. 276, 308-312; *People* v. *Collins, supra,* 26 Cal.4[th] at p. 37; *People* v. *Smith* (2003) 110 Cal.App4th 492, 500.) There is no specific formula for an effective waiver of the right to trial by jury (*People* v. *Casteneda* (1975) 52 Cal.App.3[rd] 334, 344), but the presumption is against waiver and in cases of doubtful or speculative facts, the question will be resolved against a finding of waiver. (*People* v. *Smith, supra,* 110 CalApp.4[th] at pp. 500-501.)

Below, appellant contended that his waiver of his right to trial by jury was not knowing or intelligent because the trial court's advisements failed to properly define the scope of this right, and implied that the Sixth Amendment right was applicable only to the determination of the facts constituting the charged crimes. This excluded the multitude of factual issues, collateral to the elements of the charged offense, that certainly came within the Sixth Amendment right to trial by jury as defined in *Apprendi* v. *New Jersey* (2000) 530 U.S. 466.[1]

---

[1] Other potential issues of this type, still extant before trial began, were the finding of facts in aggravation to justify an upper term, the finding of facts in aggravation to justify a discretionary consecutive term, and facts that are required to trigger a mandatory consecutive term. (*Cunningham* v. *California* (2007) _U.S. _, 127 S. Ct. 856; *Blakely* v. *Washington* (2004) 542 U.S. 296.

At the time appellant's waiver was taken on June 26, 2006, and all through trial to the imposition of judgment on July 27, 2006 (CT 233-235), a significant portion of California sentencing was erroneously deemed *not* to be subject to the federal constitutional right to trial by jury. (*People* v. *Black* (2005) 35 Cal.4th 1238, overruled in *Cunningham* v. *California, supra*,127 S.Ct. 856, and vacated in *Black* v. *California* (Feb. 20, 2007) 05-6793, 167 L.Ed.2nd 36.) This would be the state of the law, and presumably the state of any legal advisement appellant would have received from counsel regarding the scope of his right to trial by jury, when the following colloquy with the court:

> "THE COURT: Mr. Jackson, do you understand you right to have a trial by jury where 12 impartial citizens listen to the evidence, they determine the facts based on that evidence and then they reach a verdict based on the standard of proof beyond a reasonable doubt? You understand that?

> "THE DEFENDANT: Yes, I do.

> "THE COURT: Your attorney has indicated that you wish to waive your right to a jury trial and instead have the matter tried before the Court. The trial is essentially the same, but instead of having a jury determine the issues, the Court acts as finder of fact as well. Is that your intention?

> "THE DEFENDANT: Yes.

> "THE COURT: You understand that all of the other rights attendant to a jury trial, the right to confront and cross examine witnesses, call witnesses yourself, testify if you choose, and not testify if you choose not to, remain if you have a court trial?

> "THE DEFENDANT: Yes.

> "THE COURT: And, sir, you understand, it's very important, any time someone gives up a right, I want to make sure that they understand exactly what their exposure is in a given case. In this case, you are charged with eight counts, each of which carries a

potential 15 to life term and two – excuse me – I'm sorry. This has
been amended. Let me go back over this.

"Four counts which carry a maximum term of eight years
each, and you are charged with 14 counts which each carry a
potential term of 15 years to life. Basically what that means for you,
sir, is that theoretically possible for you, if convicted on all counts in
this matter – just a minute. I have to do math. I'm not particularly
good at it – to be sentenced to 150 years to life plus 14 years. Do
you understand that?

"THE DEFENDANT: Yes.

"THE COURT: All right.

"MR. WELCH: Your Honor, because these are (b) counts,
actually if we are being –

"THE COURT: I'm sorry. I didn't even notice that the four
are (b) counts.

"It is conceivable it could be plus 32 as opposed to plus 14.

"THE DEFENDANT: Yes.

"THE COURT: Thank you.

"Counsel, do you concur in your client's waiver of his right to
jury trial?

"MR. GUY: I do, Your Honor.

"THE COURT: do the People waive the right to jury trial?

"MR. WELCH: Yes.

"THE COURT: Then, counsel, a jury trial waiver having
been entered, this matter will proceed by way of court trial. . . . "
(2RT 27-28.)

5

The court in these advisements described accurately the scope of a jury trial on the issue of guilt. The court also described the other attendant trial rights that remain in the absence of a jury trial. And finally, the court tallied appellant's maximum possible sentence exposure under the information then extant. There was *no* direct advisement of a connection between the right to a jury determination and any matter related to sentencing. Further, it cannot be reasonably asserted that the connection was implied by the advisement of appellant's maximum exposure. The court itself prefaced the sentencing tally by stating, "[I]t's very important, any time someone gives up *a* right, I want to make sure that they understand exactly what their exposure is in a given case." (2RT 27, italics added.) In other words, the sentencing advisement was simply to warn the defendant what was at stake in giving up *any* fundamental right, and there was no unique connection implied here between the right to trial by jury and sentencing.

It seems clear that an advisement that does not convey the *Apprendi* principle, even if only in a general sense, misrepresents the actual scope of the right to trial by jury, and that any waiver elicited by such an advisement cannot constitute a knowing or intelligent waiver of the right to trial by jury. As the *Blakely* court itself stated, *judicial* fact-finding for sentencing, in derogation of the Sixth Amendment right, can continue *only* "[i]f appropriate waivers are procured . . ." (*Blakely* v. *Washington*, *supra*, 542 .S. at p. 310), and they cannot possibly be procured appropriately when the true scope of the right is not known by the defendant. (See *People* v. *Esquibel* (2006) 143 Cal.App.4[th] 645, 660.) A waiver taken without an advisement of the Sixth Amendment right as clarified by the *Apprendi* line of cases is not knowing or intelligent, and is therefore invalid – a conclusion drawn in several other states. (*State* v. *Dettman* (Minn.2006) 719 N.W.2[nd] 644, 650-651; *State* v. *Montour* (Colo.2007) 157 P.3[rd] 489, 499; *State* v. *Borboa* (Wash.App.2004) 102 P.3[rd] 183, 189-190; *Pennington* v. *State* (Ind.App.2005) 821 N.E.2[nd] 899, 906-907; *State* v. *Wissink* (N.C.App.2005) 617

S.E.2nd 319, 325; *State* v. *Meynardie* (N.C.App.2005) 616 S.E.2nd 21, 24; *State* v. *Ward* (Ariz.App.2005) 118 P.3rd 1122, 1126-1127.)

The Court below addressed only the citation to *State* v. *Dettman*, *supra*, 719 N.W.2nd 644, noting that it concerned the waiver of a jury trial pursuant to a guilty plea. (Slip op., pp. 18-19.) But the Court below did not explain why this distinction makes a substantive difference. The other cases cited by appellant were not addressed by the court (slip op., p. 18), and a case appearing since the briefing below from the Colorado Supreme Court holds that a guilty plea entered with advisements does *not* constitute an adequate waiver of the quite distinct right to a jury trial on sentencing facts as formulated in the *Apprendi* line of cases. (*People* v. *Montour*, *supra*,157 P.3rd at p. 499.)

Further, the court below expressed confidence that representation by counsel cured any possible deficiency in the advisements. (Slip op., p. 19 and fn. 9.) But as pointed out above, the state of the law in California as established by this Court at that time was simply wrong.

In any event, this is clearly an important question of law, which will arise not only in this context, but also in guilty-plea contexts, repeatedly. Petition for review should be granted.

## II.
## PETITION FOR REVIEW SHOULD BE GRANTED TO DETERMINE THE APPLICATION OF *APPRENDI* TO THE ONE-STRIKE LAW

Section 667.61(c) lists the offenses of conviction that are punishable under the one-strike law. They list various sexual crimes without qualification, including, currently, section 288(a). (§ 667.61(c)(4).) This was an amendment pursuant to Proposition 83, enacted on November 6, 2006. Under the form of the one-strike law applicable to this case, then section 667.61(c)(7) listed a conviction under section 288(a) as punishable under the one-strike law "unless the defendant

qualifies for probation under subdivision (c) of section 1203.066." (See *People* v. *Wutzke* (2002) 28 Cal.4th 923, 929 and fn. 5; *People* v. *Hammer* (2003) 30 Cal.4th 756, 761, fn. 5.)[2]

The question raised below was whether the *Apprendi* (*Apprendi* v. *New Jersey* (2000) 530 U.S. 466) line of cases requires the prosecution to prove beyond a reasonable doubt probation ineligibility in order to allow, as a matter of constitutional law, the one-strike enhancement to a defendant's sentence, and if so, was the absence of this finding prejudicial. Appellant contended that the finding was required and its absence was prejudicial, as will be clarified below. But the court below, following *People* v. *Benitez* (2005) 127 Cal.App.4th 1274, held that the clause concerning probation eligibility was *not* part of the trigger for a one-strike sentence, but a dispensation to allow probation at sentencing once the defendant has been convicted under section 288(a) and the applicable one-strike circumstances had been found. (Slip op., pp. 16-17.)

The difficulty with this interpretation of the statute is that the language of the statute simply does not cooperate. Not only is the language in question listed in subdivision (c) of section 667.61, which enumerates the triggering offenses punishable under the one-strike law, but the then form of subdivision (h) of section 667.61 provided: "Probation shall not be granted to, nor shall the execution or imposition of sentence be suspended for, any person who is subject to punishment

---

[2]  Section 1206.066(c) (now in fact subdivision (d)(1)), which is the portion of the statute incorporated into the applicable One Strike law,  provides that probation may be granted on the court's discretion if the following findings are made:  [¶] (1) The defendant is the victim's natural parent, adoptive parent, stepparent, relative, or is a member of the victim's household who has lived in the victim's household.  [¶]  (2) A grant of probation to the defendant is in the best interest of the child.  [¶]  (3) Rehabilitation of the defendant is feasible, the defendant is amenable to undergoing treatment, and the defendant is placed in a recognized treatment program designed to deal with child molestation immediately after the grant of probation or the suspension of execution or imposition of sentence.  [¶]  (4)  The defendant is removed from the household of the victim until the court determines that the  best interests of the victim would be served by returning the defendant to the household of the victim. . . .  [¶]5) There is no threat of physical harm to the child victim if probation is granted. . . . ."

under this section for any offense specified in paragraphs (1) to (6), inclusive, of subdivision (c)." (See *People* v. *Benitez, supra,* 127 Cal.App.4th at p. 1277, fn. 4.)[3]  This language excludes (c)(7), indicating that probation is available for a defendant convicted of that offense (whatever its scope may be) and found subject to one or more one-strike circumstances. *If* section 667.61(h) is sufficient to allow for the possibility of probation, why is probation even mentioned in subdivision (c)(7) for the triggering offenses?  In other words, the language at issue in (c)(7) is superfluous under the Court of Appeal interpretation in this case and in *Benitez*.

The answer in *Benitez* is that subdivision (h) is merely congruent with the probation qualification specified in (c)(7). (*Benitez, id.,* at p. 1278.)  However, subdivision (h) of section 667.71 speaks in terms of a *grant* of probation and in terms of offenses *subject to punishment* under One-Strike, implying that there is indeed a difference between the *qualification* denoted in the language of (c)(7) and the actual *receipt* of probation, which is the proper subject of subdivision (h). Moreover, the two provisions are not even congruent in terms of probation.  For subdivision (c) of section 1203.066, the provision incorporated into subdivision (c)(7) of section 667.61, is not the *only* way a defendant convicted under section 288(a) is eligible for, and may receive, probation.

Section 1203.066(a) announces an absolute probation ineligibility for persons convicted under section 288(b).  (§ 1203.066(a)(1).)  There is an absolute probation ineligibility for convictions under section 288(a) only under certain conditions:  if the perpetrator has caused bodily injury to the child (subd. (a)(2)); if the perpetrator was a stranger to the child (subd. (a)(3)); if the perpetrator used a

---

[3]  The current form of subdivision (h) is as follows: "Notwithstanding any other provision of law, probation shall not be granted to, nor shall the execution or imposition of sentence be suspended for, any person who is subject to punishment under this section." This, along with the change to subdivision (c) of Section 667.61 establishes that a conviction under section 288(a) in and of itself is liable for One Strike treatment and that under One Strike, probation is absolutely barred. Again, the current statute does not apply here.

weapon (subd. (a)(4)); if the perpetrator had a prior conviction for specified sexual offenses (subd. (a)(5)); if the perpetrator was kidnapping the child (subd. (a)(6)); if the perpetrator committed the crime against multiple victims (subd. (a)(7)); if the perpetrator committed "substantial sexual conduct" with the victim (subd. (a)(8)); or if the perpetrator used "obscene matter." (subd. (a)(9).) Section 12066.066(c) provides the possibility of probation for those *otherwise* disqualified absolutely under Section 1206.066(a).

Thus, when subdivision (h) of section 667.61 omits from the probation bar subdivision (c)(7) of section 667.61, this means that probation is available for *imposition* for any basis of eligibility, whether within the terms of section 1203.066(c) or on other terms. It follows from this that the probation language is section 667.61(c)(7) is part and parcel of the trigger on one-strike punishment. As such, it is subject to *Apprendi*.

As to prejudice, appellant was D.'s stepfather and also lived in the same household as all of the alleged victims. He could therefore not fail to meet the first factor specified in section 1203.066(c) (see above, p. 8, fn. 2), and the prosecution could not establish his probation ineligibility on failure to meet that requirement. As to the other factors listed in the cross-referenced probation statute, there was simply no evidence presented at all. Thus, *if* the prosecution was required to prove appellant's disqualification from a grant of probation, there was clearly no evidence at all. Thus, the *Apprendi* issue is a live question on this record.

It is also an important question of the applicability of established constitutional principles in a novel situation. Petition for review should be granted.

III.

**PETITION FOR REVIEW SHOULD BE GRANTED IN ORDER TO DETERMINE IF A DEFINITION OF "DURESS," WHICH INCLUDES THE AMORPHOUS TERMS, "HARDSHIP," SATISFIES CONSTITUTIONAL STANDARDS OF NOTICE AND ENFORCEMENT**

A violation of section 288(b) can be committed "by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury." The Legislature has not provided one for section 288(b), and the Courts have thus been left to formulate one on the principle that statutory language is to be understood in accord with "the usual, ordinary import of the language used." (*California Teachers Assn.* v. *San Diego Community College Dist.* (1981) 28 Cal.3rd 692, 698.) On this principle, in *People v. Pitmon* (1985) 170 Cal.App.3rd 38 the Court formulated a definition of duress that has become the standard for purposes of section 288(b). The *Pitmon* definition defines "duress" as "a direct or implied threat of force, violence, danger, hardship or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to (1) perform an act which otherwise would not have been performed or acquiesce in an act to which one otherwise would not have submitted." (*Id.* at p. 50.) This has been enshrined by the CALJIC committee in CALJIC No. 10.42, the jury instruction on section 288(b), and has survived into the new regime under CALCRIM in CALCRIM No. 1111. This Court has noted its approval of this instruction in *People v. Leal* (2004) 33 Cal.4th 999, 1009-1110.)

It was appellant's contention below that the term "duress," to the extent that it included the concept of "hardship," – itself undefined --, was vague under constitutional standards. Under the Due Process Clause of the Fourteenth Amendment, vagueness may invalidate a criminal law for either of two independent reasons: either the law fails to provide sufficient notice "that will enable ordinary people to understand what conduct it prohibits"; or "it may

authorize and even encourage arbitrary and discriminatory enforcement." (*City of Chicago* v. *Morales* (1999) 527 U.S. 41, 56; *People v. Castenada* (2000) 23 Cal.4th 743, 750.)

Appellant's argument below began with Justice Kennard's dissent in *Leal*:

> " . . . . "'Hardship' is a vague and amorphous concept.  It has been defined as 'suffering' or 'privation' (Webster's 3d New Internat. Dict. (2002) p. 1033), a 'lack of comfort' (Random House Webster's Unabridged Dict. (2d ed. 2001, p. 872), and 'difficulty or suffering caused by a lack of something, especially money' (Encarta World English Dict. (1999) p. 816).  A threat to withhold a child's promised allowance might well fall within these definitions, as would innumerable other threats." (*Id.*, at p. 1012, Kennard, J., dissenting.)

These dissenting observations were made in reference to the Legislature's obvious intent to distinguish the crime defined in subdivision (a) of Section 288 and that defined in subdivision (b) of the same section, and were intended to signify how an interpretation of the meaning of "duress" to include the concept of "hardship" was an inadequate construction.  (*Ibid.*)  However, the problems noted by Justice Kennard with the term "duress" point up the constitutional difficulty as well.  For when the term "duress" is understood to include "hardship," it loses its power to give notice to those subjected to the law and those who will be authorized to enforce and apply the law.  In other words, "duress" in section 288(b) is a term that "impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application." (*Grayned* v. *City of Rockford* (1972) 408 U.S. 104, 108; *People ex. Rel. Gallo* v. *Acuna* (1997) 14 Cal.4th 1090, 1116.)

The plea for this contention in the face of the majority's approval in *Leal* could only be colorable because that approval was cursory dictum.  The majority

stated: "Amicus Curiae California Attorneys for Criminal Justice argues that including 'hardship' in the definition of 'duress' would make 'duress' overly vague. But long application of the *Pitmon* definition has not demonstrated this to be the case. Only one published decision has applied the term 'hardship' in this context and no issue was raised that the term was vague." (*People* v. *Leal, supra,* 33 Cal.4[th] at p. 1009.)

The assertion is cursory in that nothing is stated about constitutional jurisprudence under the Due Process Clause regarding vagueness. Rather the majority treats the definition as though it were merely an empirical issue as to how many times the problem has arisen. Indeed, the empirical aspect is highly problematical since it is based on published decisions, which "are a tiny fraction of section 288 prosecutions," and does not take into account the influence of the vague definition of duress on guilty pleas and plea bargaining. (*Leal, id.,* at p. 1013, Kennard, J. dissenting.) The assertion is dictum because it was in response to an issue raised *not* by the parties, but by an amicus, who has no independent standing to raise an issue not raised by the parties. (*Neilson* v. *City of California City* (2005) 133 Cal.App.4[th] 1296, 1310, fn. 5; *Younger* v. *State of California* (1982) 137 Cal.App.3[rd] 806, 813-814.)

Thus, a serious constitutional problem remains addressed only in this unsatisfactory manner. Prosecutions under section 288(b) are legion; they present difficult questions of proof, especially in regard to duress. The question of the constitutionality of the definition of "duress" used for these prosecutions is an important issue of law for which review should be granted.

## CONCLUSION

For any or for all of the above reasons, petition for review should be granted.

Dated:  January 15, 2008

Respectfully submitted,

_Mark D. Greenberg_
Mark D. Greenberg
Attorney for Appellant

## CERTIFICATION OF WORD-COUNT

I am attorney for appellant in the above-titled action.  This petition has been produced by computer, and in reliance on the word-count function of the computer program used to produce this document, I hereby certify that, exclusive of the table of contents, the attached court of appeal decisions, and this certificate, this document contains 3958 words.

Dated:  January 15, 2008

_Mark D. Greenberg_
Mark D. Greenberg
Attorney for Appellants

14

**COPY**

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

F I L E D

Court of Appeal - Sixth App. Dist.

DEC 1 3 2007

MICHAEL J. YERLY, Clerk

By _____ DEPUTY

| | |
|---|---|
| THE PEOPLE, | H030492 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. BB409126) |
| v. | |
| JOHN HARDY JACKSON | |
| Defendant and Appellant. | |

In June 2006, defendant John Hardy Jackson was found guilty at a court trial of six counts of forcible lewd or lascivious acts (Pen. Code, § 288, subd. (b), hereafter section 288(b))[1] and 10 counts of nonforcible lewd or lascivious acts (§ 288, subd. (a), hereafter section 288(a)) on five child victims for which he was sentenced to a total of 222 years in state prison. His appeal attacks the voluntariness of his waiver of jury trial; the sufficiency of the evidence and the constitutionality of the definition of "duress," an element of the crime of forcible lewd or lascivious acts on a child; and the One Strike life sentences on counts 3 through 16. (§ 288(b).)

### FACTS

Defendant started molesting second-grader D. shortly after he married D.'s mother, Jennifer, in 1992. Sexual activity with D. and with foster children living in the home between 1995 and 2000 continued and escalated into sexual intercourse and oral

_____

[1] Further statutory references are to the Penal Code unless otherwise stated.

copulation until 2004 when D. was almost 18. Jennifer apparently suspected something when D. was in the fifth grade. Twice a week, Jennifer pulled D. into the bathroom in the mornings and asked if there was anything D. needed to talk about. D. always lied to her.

After these inquiries, police and a social worker contacted D. and the foster children to inquire if they were being abused. D. lied because she was afraid of losing her family if the foster children were removed and defendant went to jail. When D. finally told the truth, she was almost 18. She and Jennifer were talking when Jennifer said, "for all I know it's been happening to you for a long time." D. was nodding in agreement, and "at that point," the secret had been revealed and she could not "take it back." Police were called a few days later.

The molestation began shortly after defendant's and Jennifer's wedding. The family, defendant, Jennifer, D., and defendant's son, Raymond, who was about the same age as D., went to visit D.'s grandmother. All of them slept in their van parked in the grandmother's driveway. D. woke in the night to find her hand on defendant's penis and defendant kissing her on the mouth and touching her vagina under her clothes. She fell back asleep. In the morning defendant spoke to her about it, but other than his warning not to say anything to anybody about it, D. did not remember what he said. D. thought that defendant spoke to Jennifer about it, because Jennifer asked D. if anything happened in the van. D. made up a story that she woke up because of a nightmare. She was not afraid of defendant; she was afraid that something bad would happen if she told. Defendant later apologized for the incident.

D. got along well with defendant. Jennifer was the disciplinarian, and her relationship with D. began deteriorating in the third grade, the same grade that the molestation started. Defendant let D. do what she wanted. If she was grounded, he never enforced it until her mother got home. He acted as a buffer between the two and would do things to deflect Jennifer's anger from D. to himself. When there was less sexual

activity, however, defendant was not as nice and would let Jennifer's anger fall on D. without doing anything.

D. thought of defendant as her father. He took the family on camping trips, to concerts, and let her sit on his lap when he was driving and think she was controlling the car. Sometimes when they were camping, he would let her drive on dirt roads. D. did not forget her biological father though, and around second grade, she started asking defendant about him. D.'s father was a drug user, and although defendant said her father could visit her anytime he wanted if he just cleaned up and stayed off drugs, he never did. When D.'s father died a couple of years later, defendant helped D. through the grieving process.

D. complied with defendant's sexual requests because she did not want him to be mad at her if she did not, and she felt something bad would happen to her. She testified that when she was in the third grade, she did not feel in physical danger, "but I was afraid of losing a dad." Defendant had told her that "if anybody ever found out that he would be in trouble and that they would take us [her and the foster children] away. [¶] . . . [¶] . . . [H]e would be put in jail." When asked if defendant told her whether that would be a hardship for her, she answered, "[j]ust that I would be with my mom most likely" and that she would not have a father in her life.

In the seventh grade, defendant and Jennifer were "having problems and they were talking about getting a divorce and he did tell me that . . . if I went with my mom, it would just be me and my mom and he wouldn't be there to help me get along with my mom." Defendant told her that if her mom knew of the sexual activity between them, she "would be very upset with him and that she would try to protect [D.] . . . [and] that she would likely divorce him." By then, the "foster kids" were D.'s "family" and she did not want to lose them. She knew they would be taken away, and thought they might go to better homes, "but selfishly I didn't want them to leave." She knew "that they [the authorities] wouldn't leave them with just my mom."

3

The possibility of a divorce scared D. "a lot" because she did not want to lose her "father."[2] Defendant and Jennifer could not get along at times, and Jennifer was not happy with defendant's drinking. D. testified they fought a lot and "my mom would get upset because he would help me when I was in trouble."

Nevertheless, in the seventh grade, D. began to feel she could say no to defendant. When she did refuse him, he was not angry, nor was it "a big deal."

Counts 1 through 8 named D. as the victim. They correlated with D.'s school years and were alleged as happening between September of one year and August of the following year. Counts 1 and 2 occurred in the fourth grade from September 1995 to August 1996. Counts 3 and 4 were during the fifth grade, counts 5 and 6 in the sixth grade, and counts 7 and 8 in the seventh grade. Counts 1 through 6 alleged forcible lewd and lascivious acts under section 288(b). The latter two counts, 7 and 8, charged nonforcible lewd and lascivious acts under section 288(a).

D. testified to uncharged sexual incidents that occurred during the third grade when defendant touched D.'s vagina with his hand and she touched his penis with hers. There was also mutual oral copulation. The same acts occurred again in the fourth, fifth, and sixth grades. In the sixth grade, defendant began to have sexual intercourse with D. as well, which continued into the seventh grade. During the summer vacations, when Raymond came to live with them, sexual contact would occur less often.

The remaining eight counts alleging section 288(a) violations consisted of two allegations for each of the four foster children. When D. was in the third grade in 1995, a brother and sister, almost nine-year-old Billy and two-and-a-half-year-old Kelle, moved in. Kelle shared a room with D.; Billy had his own room except when Raymond was there in the summer. Kelle went to a babysitter during the day and Billy went to school

---

[2] Further references to D.'s "father" and "family" refer to her stepfather and foster brothers and sisters.

with D. D. witnessed defendant touch Kelle on her vagina, both under and over her clothing, on more than one occasion. She also observed defendant and Billy fondling each other's penises and having mutual oral copulation. Defendant also encouraged D. to touch Billy's penis and have sexual intercourse with him which she reluctantly did because she did not want defendant to be mad at her if she refused. She was afraid that if she told anybody, the foster kids would go back to the shelter, defendant would be put in jail, her mother would divorce defendant, and she would be alone with her mother. Counts 13 and 14 involved Kelle, and counts 15 and 16 involved Billy.

Defendant displayed adult pornography to the children and videotaped his own sex acts with D. three or four times. He showed D. the videotapes.

In December 1995, 11-year-old Jason arrived and in 1996, Billy and Kelle moved out. Shortly after Jason arrived, he was awakened in the middle of the night by defendant orally copulating him. When D. was in the fourth grade in 1996, D. witnessed fondling and oral sex between defendant and Jason and defendant encouraged her to have sex with Jason, which she did. Billy came back to visit sometimes and he and defendant engaged in fondling, mutual masturbation, and oral copulation. Later, Jason engaged in sexual activity with defendant including orally copulating and fondling defendant until Jason moved out in June 1999.

Defendant encouraged Jason in sexual activity with D., Kelle, and five-year-old Victoria, who moved in in 1998 and stayed until 2000. Jason and D. fondled each other's genitals. She was reluctant most of the time. Jason fondled Kelle's vaginal area and put his penis in Victoria's vagina. Defendant videotaped Jason's and Victoria's sexual activity. Jason was the victim in counts 9 and 10.

Jason remembered the investigation when the police and social worker interviewed the children. He thought there had been a complaint. Jason lied because he was afraid that something might happen to him, but also because he liked it at defendant's house. He thought the family was nice: they saw to it that he got to school,

5

they made him clothes, they provided him with dinner, and they went camping and as a family to concerts.

Defendant also videotaped Jason having sex with Victoria. D. observed defendant and Victoria fondling each other's genitals.

Kelle testified that defendant always put her on his lap when they watched television. He would touch her chest and her back underneath her shirt. Defendant would watch when Kelle took a bath, and she would sleep in the same bed with him. The day after Kelle and Billy moved out of defendant's home, Kelle's mother, Annette C., suggested calling "mommy Jennifer" and "daddy John." Kelle said she would talk to "mommy Jennifer" but she refused to talk to "dad John because he does that sex thing to me." When Annette C. inquired further, Kelle said defendant put her on his lap and touched her.

Victoria testified that defendant touched her vagina, put his mouth on her vagina, and touched her vagina with his penis. This happened more than once. Defendant told her not to tell anyone. Defendant also showed Victoria videos of D., Jason, and Kelle engaging in sexual activity. Victoria saw defendant touch D. inappropriately on the videotape. Defendant told Victoria he would do the same things with her. Once or twice, defendant engaged in sexual activity with Victoria while she watched the videotape. He may have asked Victoria to engage in sexual activity with Jason and D. Victoria was involved in counts 11 and 12.

Defendant waived a jury trial and the matter was tried to the court. On the second day of trial, the information was amended to conform to proof. The amended information alleged in counts 3 through 16 that defendant "has been convicted in the present case or cases of committing an offense specified in [section 288, subdivision (c), hereafter section 288(c)] against more than one victim, within the meaning of [former] Penal Code

sections 667.61 [subdivision] (b) and 667.61 [subdivision] (e)."[3]  The court found

defendant guilty as charged and found true the section 667.61, subdivisions (b) and (e)

allegations in counts 3 through 16.  This appeal ensued.

<u>ISSUES ON APPEAL</u>

Defendant contends (1) his convictions under section 288(b) must be reduced to

convictions under section 288(a) because evidence of duress was insufficient.  (2) In the

alternative to point (1), the term "duress" in section 288(b) is unconstitutionally vague.

(3) The one-strike terms imposed in this case must be reversed for insufficient evidence.

And, (4) the waiver of jury trial was not knowingly or intelligently entered.

<u>DURESS—DEFINITION AND CONSTITUTIONALITY</u>

Defendant asserts that the prosecution pursued the first six counts of forcible lewd

and lascivious acts (§ 288(b))[4] against D. on a theory of duress, namely, that defendant

obtained D.'s submission by exploiting her fear of losing her father and her family.

Asserting that there was "no evidence of a direct or implied threat of force, violence,

danger, or retribution," defendant says this case "will rise and fall on a direct or implied

threat of *hardship*, and one that is sufficient to coerce compliance."  (Italics defendant's.)

"Duress" was defined in *People v. Pitmon* (1985) 170 Cal.App.3d 38 as "a direct

or implied threat of force, violence, danger, hardship or retribution sufficient to coerce a

reasonable person of ordinary susceptibilities to (1) perform an act which otherwise

---

[3] Amendments to sections 667.61 and 1203.066 took effect after defendant's trial. All references to sections 667.61 and 1203.066 are to the statutes in effect during the 2006 trial.

[4] Section 288(b) provides in relevant part:  "Any person who commits an act described in subdivision (a) [that is, a willful and 'lewd or lascivious act . . . upon or with the body, or any part or member thereof, of a child who is under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child' (§ 288(a))] by use of force, violence, duress, menace or fear of immediate and unlawful bodily injury on the victim or another person, is guilty of a felony."

would not have been performed or, (2) acquiesce in an act to which one otherwise would not have submitted." (*Id.* at p. 50.) " '[D]uress involves psychological coercion. Duress can arise from various circumstances, including the relationship between the defendant and the victim and their relative ages and sizes . . . . "Where the defendant is a family member and the victim is young, . . . the position of dominance and authority of the defendant and his continuous exploitation of the victim" [are] relevant to the existence of duress' " (*People v. Espinoza* (2002) 95 Cal.App.4th 1287, 1319-1320) as well as to force or fear. (*People v. Superior Court* (*Kneip*) (1990) 219 Cal.App.3d 235, 239.)

In approving the *Pitmon* definition of "duress," our Supreme Court commented, "the court relied in part on the dictionary definition of 'duress' and found 'duress as used in the context of section 288 to mean a direct or implied threat of force, violence, danger, *hardship* or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to (1) perform an act which otherwise would not have been performed or, (2) acquiesce in an act to which one otherwise would not have submitted.' " (*People v. Leal* (2004) 33 Cal.4th 999, 1004 (*Leal*).)

Defendant argues the record contained no threat of force, violence, danger, or retribution and states that the People relied on threat of hardship. Developing that theory, defendant states, " '[h]ardship' itself has no fixed definition, but one might discern more clearly its substance from the *Webster* dictionary definition of 'duress' cited by the California Supreme Court as justification for *Pitmon*'s inclusion of threat of 'hardship.' One of the definitions of 'duress' in *Webster*'s is: ' "stringent compulsion by threat of danger, *hardship*, or retribution . . . ." ' (*People v. Leal, supra*, [33 Cal.4th] at p. 1009, quoting Webster's 3d New Internat. Dict. (2002), p. 703, and adding italics to the word 'hardship'; [citations].) Thus, the 'hardship' in question must be consistent with '*stringent* compulsion.' [(Italics defendant's).] This, and the general character of 'duress' as being coercive under the circumstances shows that it must be something that culpably distinguishes a lewd and lascivious act from a forcible lewd and lascivious act,

and makes it more definite than the ambiguities of dominance and force inherent in the commission of a sex crime against a child even under subdivision (a) of section 288." Therefore, defendant concludes, the convictions on counts 1 through 6 must be reduced to violations of nonforcible lewd and lascivious acts, section 288(a).

In assessing a sufficiency-of-the-evidence argument, the test on appeal is whether substantial evidence supports the conclusion of the trier of fact, not whether the evidence proves guilt beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 576.) The court must view the evidence in light of the whole record, drawing all inferences in favor of the judgment and must presume the existence of every fact in support of the judgment that could reasonably be deduced from the evidence. To uphold conviction, the record must contain evidence that is reasonable, credible, and of solid value such that any rational trier of fact could have been persuaded of the defendant's guilt. (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1382; *In re Jose P.* (2003) 106 Cal.App.4th 458, 465; *Jackson v. Virginia* (1979) 443 U.S. 307, 319.)

Although inferences may constitute substantial evidence in support of a judgment, these must be the *probable* outcome of logic applied to direct evidence, and merely speculative possibilities do not constitute substantial evidence. (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1633.) Whether an inference rationally flows from the established facts is a question of law. (*California Shoppers, Inc. v. Royal Globe Ins. Co.* (1985) 175 Cal.App.3d 1, 44-45.)

The consequences defendant used to frighten D. into compliance—deprivation of home, family, and father—were also threats of retribution, of punishment for a future action within D.'s control, namely, failing to keep silent about defendant's bad behavior. The threats also support the insinuation D. clearly entertained that any losses she suffered would be her fault. She kept silent for years because she believed that if she revealed defendant's behavior, *she* would be the catalyst for the divorce and the loss of defendant

as a father figure, for the foster children's departure, and the break-up of her desperately wanted family.

The fact that threats were made allows inferences to be drawn about defendant's state of mind and his repeated decisions not to act in conformity with the law. Defendant's strictures on D. to keep silent supports the inference that defendant knew that he wanted D. to do wrong and he intended to continue doing it whether she liked it or not. He knew D.'s compliance was not voluntary and that she needed to be forced to cooperate. The substance of the threats shows that defendant had knowledge of D.'s vulnerabilities and used them to overcome her exercise of free will. The fact that D. testified she knew that what defendant wanted her to do was wrong and she did it anyway is evidence of how effective defendant's choice of threats was on her.

In determining whether the threats would coerce a reasonable victim of ordinary susceptibilities to perform or acquiesce in an act which he or she otherwise would not have accepted (*Leal, supra,* 33 Cal.4th at p. 1004), the content of the threat must be considered in the light of the child's age, circumstances, relationship with defendant, and so on. In addition, the trier of fact may consider defendant's position as an authority figure in the home, his relationship to her mother, his relationship to her, the comparative physical sizes of defendant and D., and any other factors that are relevant to the determination.

Defendant's threat to D.—loss of parent and family—has been recognized as one of the cruelest blows a child can suffer. In some jurisdictions, a child who has lost a parent through the negligence of another has a cause of action for loss of parental consortium. "The loss of parental consortium includes 'the intangible benefits of companionship, comfort, guidance, affection, and aid of the parent in every parental relationship,' and 'the tangible benefits of general usefulness, industry, and attention within the home and family.' " (*Estate of Pearson ex rel. Latta v. Interstate Power and Light Co.* (Iowa 2005) 700 N.W.2d 333, 345-346.) It has been asserted that the "trauma

of separating a child from the custody of an adult with whom an affection-relationship exists may be psychologically equivalent in its detriment to the orphaning of that child." (Note 73 Yale L.J. (1944) p. 161, citing Freud Interviews; Burlingham and Freud, Infants Without Families, 102-106.)

Here, uncontradicted evidence shows that defendant established himself, and D. saw him, as a loving, "fun" daddy who was the provider of trips and treats, comforter when afflicted, and D.'s deflector and shield from Jennifer's disciplinary zeal. He "st[oo]d in between" her and her mother[5] and encouraged the rift between them. Defendant molded D.'s perception of her mother into an ogress against whom she had only him as an ally and protector. From the very first sexual acts in the van, defendant told D. not to mention them. As time passed, defendant continued his warnings. Eventually, when the sexual activity was an ongoing way of life for D., although she could refuse to participate, apparently without defendant's "getting mad" or its being "a big deal," she noticed that defendant withdrew his protection.

This evidence establishes duress for counts 1 through 6. The first charged lewd act occurred when D. was in the fourth grade, and she became inured to sexual activity thereafter. D.'s acquiescence was procured by defendant's manipulation of her very real

---

[5] We use the phrase "st[oo]d in between" her and her mother because D. used it during trial but neither party discusses evidence in the record to show the type of discipline Jennifer meted out, why she did so, the personalities of the people living in the household, and the circumstances of daily life that Jennifer had to cope with. Defendant's less savory behaviors such as the "drinking" that caused conflict with Jennifer only came up in passing when D. testified she was afraid there would be a divorce. On the plus side for Jennifer, for a number of years, the home passed muster with the authorities for the placement of foster children. We in no way accept as established fact that Jennifer was an abusive parent. We do accept that in D.'s mind, Jennifer was a peril to avoid, lie, and dissemble to. From evidence in the record, for example, that defendant did not enforce the rules until Jennifer came home after work and therefore appeared to D. to be allied with her against her mother, we are satisfied that defendant fostered the separation between D. and Jennifer.

fears. Defendant was a dominant figure in the home and family, and was her emotional and psychological father. There was substantial evidence of duress in the record.

We reject defendant's contention that the term "duress" is unconstitutionally vague and that it cannot give notice to those subject to the law or those who will be authorized to enforce and apply the law exactly what it prohibits. Defendant cites California Supreme Court Associate Justice Joyce Kennard's dissenting opinion in *Leal* where she states, " '[h]ardship' is a vague and amorphous concept. It has been defined as 'suffering' or 'privation' [citation], a 'lack of comfort' [citation], and 'difficulty or suffering caused by a lack of something, especially money' [citation]. A threat to withhold a child's promised allowance might well fall within these definitions, as would innumerable other threats." (*Leal, supra,* 33 Cal.4th at p. 1012 (dis. opn. of Kennard, J.).)

A law is unconstitutionally vague if it fails to provide adequate notice to those who must observe its limits. (*People v. Rubalcava* (2000) 23 Cal.4th 322, 332; see U.S. Const., First & Fourteenth Amends.; Cal. Const., art. I, § 15.) "In evaluating a vagueness claim, 'the touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal.' " (*People v. Powers* (2004) 117 Cal.App.4th 291, 298, quoting *United States v. Lanier* (1997) 520 U.S. 259, 267.)

A statute is not impermissibly vague if its terms can be reasonably understood by reference to other definable sources such as statutes, the common law, its legislative history, and judicial decisions. (*American Civil Liberties Union v. Board of Education* (1963) 59 Cal.2d 203, 218; *People ex rel. Gallo v. Acuna* (1997) 14 Cal.4th 1090, 1116-1117; *County of Nevada v. MacMillen* (1974) 11 Cal.3d 662, 673; *People v. McCaughan* (1957) 49 Cal.2d 409, 414, superceded by statute on another point as stated in *People v. Anderson* (2001) 25 Cal.4th 543, 572; *Williams v. Garcetti* (1993) 5 Cal.4th 561, 569-570.)

The *Pitmon* definition of "duress" has been followed since 1985. *Leal* stated that "the long application of the *Pitmon* definition has demonstrated" that including " 'hardship' in the definition of 'duress' does not make" it unconstitutionally vague. (*Leal*, *supra*, 33 Cal.4th at p. 1009.) Defendant dismisses this statement because this issue was raised in *Leal* by amicus curiae, "*not* a party to the case" (italics defendant's), and "*Leal* treated it as a passing observation in reference to statutory construction." Defendant stated that since the issue was not addressed on the merits in *Leal*, *Leal* cannot be "authority for [a] proposition[] not considered." (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1171.)

Notwithstanding, the "long application of the *Pitmon* decision" (*Leal*, *supra*, 33 Cal.4th at p. 1009) is an example of a statute being reasonably understood by reference to other definable sources such as the judicial decisions that make up the common law. The statute was not so vague that defendant did not know what was forbidden in regard to his conduct with children.

<u>THE ONE-STRIKE SENTENCES</u>

Next, defendant asserts that the due process clause places on the prosecution the burden of proving beyond a reasonable doubt not only that he committed a violation of section 288 against more than one victim in this case (§ 667.61, subd. (e)(5))[6] which

---

[6] At the time of defendant's trial in June 2006, section 667.61, subdivision (b), provided in relevant part: "Except as provided in subdivision (a), a person who is convicted of an offense specified in subdivision (c) under one of the circumstances specified in subdivision (e) shall be punished by imprisonment in the state prison for life and shall not be eligible for release on parole for 15 years except as provided in subdivision (j)." Subdivision (c)(4) stated it applied to section 288(b), and subdivision (c)(7) stated it applied to section 288(a) unless the defendant qualifies for probation under section 1203.066, subdivision (c). Section 667.61, subdivision (e), stated the circumstances that applied to offenses specified in subdivision (c). As is relevant in this case, subdivision (e)(5) applied when "[t]he defendant has been convicted in the present case or cases of committing an offense specified in subdivision (c) against more than one victim." Subdivision (h) stated, "Probation shall not be granted to, nor shall the (continued)

would disqualify him from probation and make him eligible for One Strike punishment, but also that he was ineligible for probation under section 1203.066, subdivision (c), which stated requirements for sentencing leniency. Defendant reasons that because *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*) requires the prosecution to prove factors in aggravation, namely, " 'sentencing facts' [that] are subject to the Sixth Amendment right to trial by jury if they . . . 'allow[] a judge to impose a sentence above the statutory maximum based on a fact, other than a prior conviction, not found by a jury or admitted by the defendant' (*Cunningham v. California* (2007) __ U.S. __ [127 S.Ct. 856, 860])," it was the prosecution's burden to present proof negating the provisions of section 1203.066, subdivision (c).[7] Therefore, defendant states, the court erred in imposing the One Strike life terms because the prosecution failed to prove that defendant was *not* a parent, stepparent or a member of the victims' household, that probation for defendant was *not* in the best interest of the victim, etc. (See fn. 7 *ante*.)

---

execution or imposition of sentence be suspended for, any person who is subject to punishment under this section for any offense specified in paragraphs (1) to (6), inclusive, of subdivision (c)." Subdivision (i) stated, "For the penalties provided in this section to apply, the existence of any fact required under subdivision (d) or (e) shall be alleged in the accusatory pleading and either admitted by the defendant in open court or found to be true by the trier of fact."

[7] Section 1203.066, subdivision (c), as referenced in section 667.61, subdivision (c)(7), provides that the ban on probation for defendants convicted of section 288 shall not apply when the court makes all of the following findings: (1) The defendant is the victim's natural, adopted, or stepparent, a relative or a member of the victim's household who has lived in the victim's household; (2) a grant of probation is in the best interest of the child; (3) rehabilitation of the defendant is feasible; the defendant is amenable to undergoing treatment, and the defendant is placed in a recognized treatment program for child molestation immediately after the grant of probation or suspension of execution or imposition of sentence; (4) the defendant is removed from the victim's household until the court determines that the best interests of the victim would be served by the return of the defendant. While removed, the court shall prohibit or, under certain conditions, may permit supervised contact of the defendant with the victim; and (5) there is no threat of physical harm to the victim if probation is granted.

According to defendant, a finding of guilt of a section 288(a) violation alone is "insufficient to trigger a life term under One Strike[;] . . . there must be a finding of probation disqualification as well. This is classically the type of finding to which the *Apprendi* principle must apply." Defendant finds a "constitutional parallel" "between a special circumstance that renders a defendant eligible for the death penalty, and . . . the balance of aggravat[ing] and mitigat[ing] [factors] that guide[] the choice between life imprisonment and death once eligibility is established. The former is subject to the *Apprendi* principle while the latter is not. (*People v. Davis* (2005) 36 Cal.4th 510, 563-564; *People v. Demetrulias* (2006) 39 Cal.4th 1, 41; cf. *Ring v. Arizona* [(2002)] 536 U.S. 584, 602-603.)"

There can be no argument with the application of the "*Apprendi* principle" to a determination of eligibility for the death penalty, or of eligibility for a greater punishment than the maximum penalty a judge may impose without any additional findings. (*Blakely v. Washington* (2004) 542 U.S. 296, 303-304.) However, for a violation of section 288(a) to fall under the provisions of section 1203.066, subdivision (c), "the existence of any fact required in subdivision (a) [must be] alleged in the accusatory pleading and . . . either admitted by the defendant in open court, or found to be true by the trier of fact." (§ 1203.066, subd. (c)(1).) "For the existence of any fact under paragraph (7) of subdivision (a)[, as is relevant here, that the defendant was convicted of molesting more than one victim in the case] the allegation must be made pursuant to this section." (*Id.,* subd. (c)(2).) Section 667.61, subdivision (i) also requires the same allegation. In the instant information, a separate allegation also charged that defendant was ineligible for probation and suspension of sentence (*id.,* subd. (a)(1)) in all counts.

Sitting as the trier of fact, the court found defendant guilty of violating section 288(b) in counts 1 through 6, and section 288(a) in counts 7 through 16. The court found true the allegations in counts 3 through 16 of the amended information that defendant has "been convicted in the present case of committing an offense specified in

[subdivision] (c) against more than one victim within the meaning of Penal Code sections 667.61[, subdivision] (b) and 667.61[, subdivision] (e)."

The prosecution does not have the burden of proving probation disqualification beyond a reasonable doubt in order to establish the applicability of the One Strike law as defendant claims. "All defendants are eligible for probation, in the discretion of the sentencing court, unless a statute provides otherwise." (*People v. Bruce G.* (2002) 97 Cal.App.4th 1233, 1247.) "In enacting section 1203.066 it appears that the Legislature intended that state prison be the sentencing norm in child molestation cases, meeting the criteria in subdivision (a), and that the defendant bear the burden of persuading the court to depart from that norm by granting probation." (*People v. McLaughlin* (1988) 203 Cal.App.3d 1037, 1039.) In this case, the statutes that provided probation ineligibility were alleged and found true as to all counts. Under similar circumstances, an appellate court stated that an appellant had "failed to carry his burden of persuading the court to grant probation" (*People v. Lammey* (1989) 216 Cal.App.3d 92, 98) where "appellant presented no evidence regarding whether the child's best interest required that he not be imprisoned ([§ 1203.066,] subd. (c)(2)), whether rehabilitation was feasible (subd. (c)(3)), or whether he caused a threat of physical harm to the child if not imprisoned (subd. (c)(4))." (*Ibid.*) It is the defendant's burden of proof as to each fact the existence or nonexistence of which is essential to the claim for relief or the defense that he is asserting. (Evid. Code, § 500.) Where the evidence necessary to establish a fact essential to a claim lies peculiarly in the knowledge and competence of one of the parties, that party has the burden of going forward with the evidence. (*Morris v. Williams* (1967) 67 Cal.2d 733, 760.)

Sentencing is the time for the trial court to decide whether a defendant is eligible for probation. (§ 1203; Cal. Rules of Court, rule 4.413, hereafter rule, formerly, rule 413.) At sentencing, the court has available to it the probation officer's presentence investigation report which contains, among other things, the defendant's statement to the

probation officer including the defendant's account of the circumstances of the crime, the defendant's social history, collateral information including written statements from official sources such as defense and prosecution attorneys, later police reports, statements from probation and parole officers who have had prior experience with the defendant and correctional personnel who observed the defendant's behavior during any period of presentence incarceration; and interested persons such as family members and others who have written letters concerning the defendant. (Rule 4.411.5, formerly, rule 411.5.)

If the information presented at sentencing causes the court to believe probation is a possibility, the court must order a psychological report pursuant to section 288.1. (§ 1203.067, subd. (a)(3), incorporated into § 667.61 through subd. (7) and § 1203.066, subd. (c).) However, where the court is " 'not inclined' " to grant probation on information before it (*People v. Thompson* (1989) 214 Cal.App.3d 1547, 1550), there is no need for a diagnostic report. (*People v. Ramirez* (2006) 143 Cal.App.4th 1512, 1532.)

In addition to the authority discussed *ante*, *People v. Benitez* (2005) 127 Cal.App.4th 1274 (*Benitez*), stated that the Legislature granted authority to the trial court to entertain a request for probation if a defendant satisfies the criteria in section 1203.066, subdivision (c), despite a defendant's eligibility otherwise for sentencing under section 667.61. Probation is an act of clemency on the part of the trial court. "Because a defendant's eligibility for probation results in a *reduction* rather than an increase in the sentence prescribed for his offenses, it is not subject to the rule of *Blakely*." (*Benitez*, *supra*, 127 Cal.App.4th at p. 1278.)

The no-probation allegations in the instant information were statutorily required to be pled and proved by the prosecution. They were. Evidence supporting the factors that would enable a grant of probation upon consideration by the court was the defendant's burden to produce. He did not. The trial court did not err in imposing the One Strike sentences.

## JURY WAIVER

Finally, defendant asserts that he did not knowingly or intelligently waive his right to a jury trial. He claims the court's advisements "failed to properly define the scope of this right, and implied that the Sixth Amendment right was applicable only to the determination of the facts constituting the charged crimes. This excluded the multitude of factual issues, collateral to the elements of the charged offense, that certainly came within the Sixth Amendment right to trial by jury as defined in *Apprendi*[, *supra*,] 530 U.S. 466."

Defendant concedes that the court's advisements accurately described the scope of a jury trial on the issue of guilt and other trial rights that remain in the absence of a jury trial.[8] The fatal flaw was the lack of a "direct advisement of a connection between the right to a jury determination and any matter related to sentencing. Further, it cannot be reasonably asserted that the connection was implied by the advisement of [defendant's] maximum exposure. . . . [T]he sentencing advisement was simply to warn the defendant what was at stake in giving up *any* fundamental right, and there was no unique connection implied here between the right to trial by jury and sentencing."

Defendant complains that "an advisement that does not convey the *Apprendi* principle . . . misrepresents the actual scope of the right to trial by jury, and that any waiver elicited by such an advisement cannot constitute a knowing or intelligent waiver of the right to trial by jury." In support of this statement, he cites a number of sister state opinions. In the first on his list, *State v. Dettman* (Minn. 2006) 719 N.W.2d 644, 650-651, the Minnesota Supreme Court stated, "we hold that a defendant must expressly,

---

[8] The court advised that a jury waiver would mean the trier of fact would be the court rather than a jury composed of "12 impartial citizens," and that defendant retained the right to confront and cross-examine witnesses, call his own witnesses, and testify or not as he chose. The court stated defendant's maximum exposure to prison was 150 years to life plus 32 years. Defendant stated he understood each right and the consequences and that he waived the right to jury trial.

knowingly, voluntarily, and intelligently waive his right to a jury determination of facts supporting an upward sentencing departure before his statements at his guilty-plea hearing may be used to enhance his sentence." Unlike Dettman, defendant was not waiving his right to a trial so he could plead guilty. Defendant was waiving his right to a trier of fact of 12 persons in favor of a court trial.

When a defendant waives a jury trial, he is deemed to have consented to a trial of all of the issues in the case before the court sitting without a jury. (*People v. Jarmon* (1992) 2 Cal.App.4th 1345, 1354-1355.) Here, defendant had been arraigned on an information that pled allegations that he was ineligible for probation as required by sections 667.61, subdivision (i) and 1203.066, subdivision (c). The information gave notice that it contained allegations that would, if found true, render defendant ineligible for probation and that, by reference to the statutes cited, it gave him notice that he would be eligible for One Strike sentences. Defendant was represented by counsel[9] who consented to the waiver of a jury trial.

The trial started on June 26, 2006. The court asked defendant if he agreed to have "the matter" tried by the court and he answered yes. The document which was the subject of either a jury or court trial was the information. There was no suggestion that any charge or allegation in the information would be tried separately from any other. Therefore, when defendant waived the right to jury trial and consented to have "the matter" tried before the court, he gave up the right to jury trial on all issues contained in the information. The waiver was knowing and intelligent.

### DISPOSITION

The judgment is affirmed.

---

[9] We note that the record contains a persistent complaint about defense counsel raised in several written motions pursuant to *People v. Marsden* (1970) 2 Cal.3d 118 dated as late as October 7, 2005. However, a satisfactory solution was apparently reached earlier than that in August 2005. No *Marsden* issue was raised on appeal.

_____
                    Premo, J.


WE CONCUR:


_____
        Rushing, P.J.


_____
        Elia, J.


People v. Jackson
H030492

# C-08-02254- SBA

**"EXHIBITS TO PETITION FOR WRIT OF HABEAS CORPUS BY A STATE PRISONER"**

**Index To Exhibits :**

1)* Petition for a Writ of Habeas Corpus by a person in State
    Custody.

2)* Prisoner's Application To Proceed In Forma pauperis,
    Attached letter of request for Court appointed counsel.

2)* Copy of PETITION FOR PEVIEW In THE SUPREME COURT OF THE
    STATE OF CALIFORNIA.

3)  Attached copy of Supreme Courts decision,at end of the
    Petition For Review.


**Note to the United States District Court,Northern Devision:**

The Appellant in this pitition,is currently being held in
the state of Colorado,compleating his sentence of 12 years
for other charges. He will be released to the state of
California,upon completetion of his sentence. At this time
the Appellant does not have a California Department of
Corrections case number at this time.



049J82041378
$02.16⁰
Mailed From 8⁰⁰12
04/24/2008
US POSTAGE

Colorado Department of Corrections

Name: Philip McCray
Register Number: 1211b6
Unit: F.C.E.
Box Number: 999
Canon City, Colorado 81215-0999

Clerk's Office
U.S. District Court - N⁰ Dist of CA.
450 Golden Gate Ave 16ᵗʰ floor
San Francisco, CA 94102